UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| MARK FITZSIMMONS, )<br>)<br>  Plaintiff, )<br>)<br>v. )<br>)<br>BIOMET, INC., BIOMET )<br>ORTHOPEDICS, LLC and )<br>BIOMET MANUFACTURING )<br>CORP. )<br>)<br>  Defendants. ) | Case No. 2:19-cv-182-FtM-29NPM |

**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF TRACY WINGATE AND MEMORANDUM IN SUPPORT**

Defendants Biomet, Inc., Biomet Orthopedics, LLC, and Biomet Manufacturing, LLC (formerly known as Biomet Manufacturing Corp.) (collectively, "Defendants" or "Biomet"), pursuant to Federal Rule of Evidence 702 and *Daubert* and its progeny, move the Court to limit or exclude certain opinions of Plaintiff's life care expert, Tracy Wingate. Despite being a certified life care planner, Ms. Wingate chose to prepare an inadmissible "medical cost projection" which she admits lacks the rigor and comprehensive approach required of an admissible life care plan. In addition, Ms. Wingate's projections are based solely (and impermissibly) on the opinions of Plaintiff's retained orthopedic expert, Dr. George Kantor – who conceded at deposition that many of the future care projections are "speculative," "purely guesswork," and *not* "more likely than not" to occur in the future. For these reasons, Ms. Wingate's opinions and her corresponding medical cost projection must be excluded.

1

I.  **BACKGROUND**

Ms. Wingate is an occupational therapist who has been certified as a life care planner since 1995. *See* Deposition of Tracy Wingate ("Wingate Dep."), Ex. A, 18:6-8. She has owned her own business, Life Care & Rehabilitation Consultants, Inc., since 1991. *Id.* at 18:10-19. Ms. Wingate is a fellow of the International Association of Life Care Planning ("IALCP"). *Id.* at 18:3-9.

Instead of preparing a life care plan in this case, Ms. Wingate prepared only a basic medical cost projection ("MCP") which purports to lay out Mr. Fitzsimmons' future medical needs with corresponding costs. *Id.* at 38:5-11. Contrary to the standards of practice applicable to life care planners (which, ironically Ms. Wingate served on the committee which enacted the most recent standards), Ms. Wingate created her MCP without assessing or speaking with Mr. Fitzsimmons or his close family members; without consulting any of Mr. Fitzsimmons' treating physicians; without reviewing Mr. Fitzsimmons' medical records or billing; and without reviewing any depositions (Plaintiff, Dr. Kelso, or Dr. Stolarski). *Id.* at 34:2-7; 38:21-39:9; 41:5-7. In Ms. Wingate's words, "[she] basically consulted with Dr. Kantor on what future problems were going to incur, when that was going to be, what he was going to need, and then [she] priced it." *Id.* at 44:1-11.

Ms. Wingate's MCP totals 20 pages and includes projections for at least five future surgeries, orthopedic evaluations, diagnostic tests, durable medical equipment, and household services. S*ee generally* Exhibit 3 of Deposition of Tracy Wingate ("MCP"), Ex. B. She projects future medical costs of over $2,000,000 through Plaintiff's life expectancy of 83. *Id.* Her full 83-page report includes a summary consultation with Dr. Kantor, Dr. Kantor's expert report,

and CVs from both Dr. Kantor and Ms. Wingate. *See* Exhibit 2 of Deposition of Tracy Wingate ("Wingate Report"), Ex. C.

Ms. Wingate testified that she relied wholeheartedly upon Plaintiff's retained orthopedic expert, Dr. Kantor, as to the necessity of Mr. Fitzsimmons' future medical needs. *See, e.g.* Wingate Dep., Ex. A, 57:1-10. In doing so, Ms. Wingate failed to consider (or even review) critical facts and data related to Plaintiff's current condition, recent medical treatment, and input from the Plaintiff and his treating orthopedist, Dr. Stolarski.

Even if Ms. Wingate's reliance on solely Plaintiff's retained expert was sufficient to satisfy *Daubert* (it is not), the full extent of Ms. Wingate's collaboration with Dr. Kantor included reviewing Dr. Kantor's report, consulting with him "for about an hour," and asking him a few follow-up questions. *Id.* at 46:20-47:9. Considering the deficiencies in Ms. Wingate's methodology, it is not surprising that her testimony and MCP conflict with the testimony of Dr. Kantor on the most fundamental aspect of Ms. Wingate's projections: the necessity of Plaintiff's future medical care. Although Ms. Wingate testified that all but one of the future surgeries listed in her MCP have a greater-than-50-percent probability of occurring in the future (*id.* at 28:22-29:4), Dr. Kantor testified that all future surgeries were "obviously … speculative" and "purely guesswork." Deposition of Dr. George Kantor ("Kantor Dep"), Ex. D, 252:7-253:24; 261:16-25. Dr. Kantor also provided the following testimony with respect to each projected future surgery:

| | |
|---|---|
| 1. **Possibility of future revision surgery due to periprosthetic fracture** (MCP, Ex. B, pg. 16, line 38) | 20-40% chance of occurrence (Kantor Dep., Ex. D, 250:5-251:2) |
| 2. **Possibility of future revision surgery due to periprosthetic femur fracture** | "it would be purely guesswork" and "it's so speculative and so far down the road" that |

3

| | | |
|---|---|---|
| | (MCP, Ex. B, pg. 17, line 39) | Dr. Kantor cannot place a percentage of likelihood of occurrence. (Kantor Dep., Ex. D, 251:3-252:24) |
| 3. | **Possibility of future revision surgery due to dislocation (requiring conversion to a dual mobility or a constrained reconstruction)** (MCP, Ex. B, pg. 18, line 40) | "I can't answer that question. He's never sustained a dislocation here before, so I don't know why you would be – you would be introducing a dual mobility for treatment of something he hasn't had." (Kantor Dep., Ex. D, 252:25-253:9) |
| 4. | **Possibility of future surgeries due to infection** (MCP, Ex. B, pg. 19, line 41) | 10 to 20% chance of occurrence (Kantor Dep., Ex. D, 253:25-254:19)<br><br>10% to 15% chance of occurrence (Wingate Dep., Ex. A, 29:1-4) |

Because Ms. Wingate claims to have relied solely on Dr. Kantor as to the necessity of Plaintiff's future medical care, and Dr. Kantor testified that projecting Plaintiff's future medical care is "speculative" and "purely guesswork," Ms. Wingate's entire MCP is inherently unreliable. Wingate Dep., Ex. A, 29:16-23 (agreeing that her projections are only as accurate as the sources she relies upon, and if the information she gathered is based upon a faulty premise, then her projections would similarly be based on a faulty premise). At a minimum, the projected surgeries, and projected treatment related to each surgery, should be excluded because Dr. Kantor was unable to testify that the surgeries are likely to occur in the future.

At bottom, Ms. Wingate relies upon cherry-picked information, utilizes no accepted methodology, violates the standards applicable to her very profession, and attempts to justify the shortfalls in her future medical projections by referring to them as a MCP rather than a LCP. Further, Ms. Wingate's opinions will not assist the trier of fact because, according to the

testimony of Dr. Kantor, most of the projections are not likely to occur in the future. As a result, Ms. Wingate's medical cost projections and corresponding opinions must be excluded.

## II.     LEGAL STANDARD

The Federal Rules of Evidence and the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), require the trial judge, as a gatekeeper, to determine whether an expert's testimony is reliable and relevant. Fed. R. Evid. 702; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) ("Under Rule 702 and *Daubert*, [509 U.S. at 589,] district courts must act as 'gate keepers' and admit expert testimony only if it is both reliable and relevant.").[1] The proponent of the expert opinion bears the burden of establishing its admissibility. *Rink,* 400 F.3d at 1292; *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit.").

Under Rule 702, an expert witness may provide opinion testimony so long as:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] Federal law governs the admissibility of expert testimony in diversity actions. *See, e.g., Bryte v. Am. Household, Inc.*, 429 F.3d 469, 476 (4th Cir. 2005). In multidistrict litigation, the law of the transferee circuit (here, the Eleventh Circuit) governs on federal law. *See, e.g., In re Temporomandibular Joint Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996); *In re Stucco Litig.,* 364 F. Supp. 2d 539, 540 (E.D.N.C. 2005) ("In the context of this multidistrict case, the court must apply the law of the Fourth Circuit when analyzing questions of federal law.").

Fed. R. Evid. 702. As the gatekeeper, the trial court must determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in [*Daubert*]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*United States v. Delva*, 922 F.3d 1228, 1251 (11th Cir. 2019) (quoting *United States v. Holt*, 777 F.3d 1234, 1265 (11th Cir. 2015)). These three prongs are called the "qualification, reliability, and helpfulness" criteria. *Arevalo v. Coloplast Corp.*, No. 3:19CV3577-TKW-MJF, 2020 WL 3958505, at *1 (N.D. Fla. July 7, 2020) (Wetherell, J.) (quoting *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942 (11th Cir. 2015)). The proponent of the testimony bears the burden of establishing each requirement by a preponderance of the evidence. *Id.*

The "reliability" criterion is important here. Under this criterion, the Court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The trial court's obligation is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

The "helpfulness" criterion — that the evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" — is also important here. In *Daubert,* the Supreme Court explained:

> This condition goes primarily to relevance. … [One] aspect of relevancy … is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. The consideration has been aptly described ... as one of "fit."

509 U.S. at 591-92; *see also, e.g., Guenther v. Novartis Pharm. Corp.*, No. 6:08-CV-456-ORL-31, 2013 WL 1277928, at *2 (M.D. Fla. Mar. 28, 2013) (Presnell, J.) (as gatekeeper, trial court must verify that expert testimony or opinion will "assist the trier of fact" or "fit" a matter at issue) (quoting *Daubert*, 509 U.S. at 592); *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1193 (11th Cir. 2010); *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (expert testimony does not assist the trier of fact if it fails to "fit").

### III. ARGUMENT

#### A. Ms. Wingate's opinions are based upon insufficient facts and data and are the product of an unreliable methodology.

The Court should preclude Ms. Wingate's opinions because she employed a flawed methodology in preparing a cursory projection based upon cherry-picked information, rather than a comprehensive projection based upon all relevant facts and data. In order to satisfy the requirements of Daubert and Rule 702, an expert's opinions must be based upon sufficient facts or data, and the expert must have utilized a reliable methodology and reliably applied that methodology to the facts of the case. Fed. R. Civ. P. 702(b)-(c). Specifically, "[t]here must be a sufficient factual basis for each expert opinion, and in its absence, the opinion should be excluded as 'imprecise and unspecific.'" *Hughes v. GEICO Gen. Ins. Co.,* No. 615CV280ORL40GJK, 2017 WL 7000273, at *4 (M.D. Fla. Aug. 31, 2017) (striking expert's opinion where expert did not conduct "any meaningful analysis" and left the court to wonder "how he calculated" the numbers in his expert report)*; see also Mosby v. Railey*, No. 5:03-CV-167-OC-10GRJ, 2005 WL 8159837, at *4 (M.D. Fla. July 29, 2005) (excluding expert testimony where expert "ha[d] not relied on sufficient facts or data" when he relied on "anecdotal evidence," performed no analysis, and "never spoke or corresponded with

Plaintiff"). With respect to the reliability prong, courts consider several factors: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir.2003). The Plaintiff cannot meet his burden of establishing that Ms. Wingate's opinions satisfy either requirement.

Ms. Wingate is a certified life care planner and a fellow of the IALCP. Despite working on the IALCP committee that created the most recent Standards of Practice for Life Care Planners, Ms. Wingate failed to follow these very standards. Wingate Dep., Ex. A, 18:6-9; Exhibit 6 of Deposition of Tracy Wingate ("Standards"), Ex. E. Ms. Wingate tries to justify this failure by referring to her cost projections as a MCP rather than a LCP. Wingate Dep., Ex. A, 32:15-22. Regardless of the document's title, Ms. Wingate's opinions as to Plaintiff's projected medical care are the product of an unreliable methodology.

According to Ms. Wingate, unlike a life care plan, "there are no standards which govern a person preparing a medical cost projection" and no "governing bodies" that set forth guidelines related to the methodology of MCPs. Wingate Dep., Ex. A, 69:3-6; 128:18-21. Even though she claims her MCP "doesn't really fall within the standards for a life care plan" and therefore she was not required to follow those standards (*id.* at 33:3-35:5; 32:17-23; 37:6-38:11), she testified that "[she's] still using similar methodology" (*id.* at 33:14-18). Ms. Wingate's testimony that she utilized a "similar methodology" is not borne out by the facts.

By her own admission, Ms. Wingate's entire methodology consisted of reviewing Dr.

8

Kantor's expert report, consulting with him by phone for an hour, exchanging written communications, and then pricing out Dr. Kantor's recommendations. Ms. Wingate's methodology not only violates the standards governing life care planners, but by her own admission she would have engaged in a much more comprehensive analysis if she had been asked by Plaintiff's counsel to prepare a life care plan. Specifically, Ms. Wingate admits that she failed to do any of the following assessments, but would have done them had she been asked by Plaintiff's counsel to prepare a true life care plan:

- Assess (or substantively communicate with) the Plaintiff, Mark Fitzsimmons (Wingate Dep., Ex. A, 33:23-34:11; 133:20-22);

- Consult with Plaintiff's close family member(s) (*id.* at 42:16-19)[2];

- Review medical records (*id.* at 34:24-35:2);

- Review complete medical billing (*id.* at 131:21-132:1);

- Review the depositions of the Plaintiff, Dr. Kelso, or Dr. Stolarski (*id.* at 39:5-9; 40:18-41:1; 41:5-7; 117:5-9; 133:23-24);

- Consult Plaintiff's revising surgeon (*id.* at 38:21-39:9; 45:13-21).; and

- Consult with any of Plaintiff's treating physicians (Wingate Dep., Ex. A, 35:23-36:3; 117:1-4; 117:19-118:17; 130:4-7).

*See* Standards, Ex. E, pg. 8-10 (listing each of the above assessments as part of the comprehensive approach required by a life care planner).

Not only does Ms. Wingate's methodology violate the standards of practice applicable to life care planners, her opinions are based on wholly insufficient facts and data. *See* Fed. R. Civ. P. 702(b); *Hughes,* 2017 WL 7000273, at *4; *Mosby,* 2005 WL 8159837, at *4. Ms.

---

[2] Ms. Wingate equivocated as to whether she would have consulted with Plaintiff's wife if she had prepared a life care plan.

Wingate based her projections solely on cherry-picked information from the Plaintiff's retained expert – without consideration of critical information such as the Plaintiff's medical records, the opinions and recommendations of Plaintiff's treating physicians, deposition testimony, or a thorough consultation and assessment with the Plaintiff himself.[3] This is particularly concerning given that Ms. Wingate projects 4 future surgeries (including one procedure which requires staged surgeries) and medical costs exceeding $2,000,000 over Plaintiff's remaining 15-year life span. In contrast, Plaintiff's medical records – particularly his last visit with his orthopedist, Dr. Stolarski – provide a very different outlook as to Plaintiff's current condition and prognosis:

> Mr. Fitzsimmons is two and one-half years out from a complex right hip revision. He is doing very well. He is very pleased. No ambulatory aids. No groin pain. He has a little bit of lateral pain with prolonged driving.
>
> **X-RAYS**: Radiographs of the pelvis and right hip, AP and lateral, show long stem revision total hip arthroplasty implants are well fixed and well positioned, with no fracture, lucency, subsidence, or malposition.
>
> **PLAN**: We will see him in three years. We did review dental prophylaxis.

Exhibit 4 of Deposition of Tracy Wingate ("Medical Records"), Ex. F, pg. 2.

There is no question Plaintiff's medical records undermine Ms. Wingate's cost projection as it pertains to the necessity of Plaintiff's projected future care, including routine orthopedic visits, diagnostic and lab testing, as well as the likelihood of a numerous future surgeries. At a minimum, the rigors of *Daubert* require a life care planner to review basic, objective information such as a Plaintiff's medical records before preparing a medical care

---

[3] In the beginning of her deposition, Ms. Wingate testified she did not speak with Mr. Fitzsimmons, but later recalled that she may have had a very brief telephone call with him. Wingate Dep., Ex. A, 42:10-15 (Q: "And I understand that you did not speak to [Mr. Fitzsimmons] in this case, is that right?" A: "Right, I did not."); 132:3-15 ("I do remember talking with him . . . I talked with him briefly.").

projection. There is a reason why the IALCP standards mandate a comprehensive approach – to ensure reliability and accountability in the profession. Common sense dictates that this type of relevant information be considered by an expert who offers opinions as to the projected medical care for the rest of Plaintiff's life.

Ms. Wingate's attempt to dodge the standards required of her profession (and required under *Daubert*) by labeling her opinions as a MCP rather than a LCP must be rejected. In substance, Plaintiff seeks to offer Ms. Wingate as an expert life care planner to present to the jury projected future medical costs. But by Ms. Wingate's own admission, her approach in preparing the MCP, as opposed to a LCP, has not been generally accepted in the medical community. Wingate Dep., Ex. A, 32:17-33:11 ("[A] medical cost projection . . . doesn't really fall within the standards for a life care plan[.]"); 37:6-38:7 (Q: "Is there -- Are there any standards of practice or any guidelines that govern the methodology for a medical cost projection?" A: "I think everything that I'm aware of has to do with life care planning."); 109:21-110:6 (Q: "Is it your testimony today that because you performed medical cost projections instead of a life care plan that you are not required to follow the standards of practice set forth by the International Academy of Life Care Planners?" A: "It doesn't indicate that a simple cost projection falls within that."); 128:7-21 (Q: "And I believe from your testimony earlier then there are no standards which govern a person preparing a medical cost projection; is that true?" A: "Not to my knowledge. That's correct.").

Ms. Wingate could not cite to any studies, literature, or published sources that informed her MCP (*id.* at 69:7-10); she made no connection between her proffered opinions and any literature or scientific principle (*id.*; *see generally* Wingate Report, Ex. C, no literature,

11

standards of care, or scientific principals included); there is no known rate of error (Wingate Dep., Ex. A, 25:24-30:11); and she does not assert that the methodology she used has been subjected to peer review (*id.* at 69:7-10). *See Bushore v. Dow Corning-Wright Corp.*, No. 92-344-CIV-T-26C, 1999 WL 1116920, at *3 (M.D. Fla. Nov. 15, 1999) ("[T]he fact of publication in a peer reviewed journal is a relevant . . . consideration in assessing the scientific validity of a particular methodology".); *Cook v. Smith,* No. 606CV456ORL22DAB, 2006 WL 8439583, at *4 (M.D. Fla. May 30, 2006) (finding expert's methodology was "not reliable" because it was "not capable of peer review"). Although Ms. Wingate has published and presented on life care plans, she has never published or presented on the methodology she employed in this case. Wingate Dep., Ex. A, 23:13-24:8.

While courts in this Circuit have permitted qualified life care planners to offer opinions as to future medical care based upon appropriate life care plans, there is no authority for the admissibility of opinions derived from a simplified medical cost projection or a limited analysis like the one performed by Ms. Wingate. *See Garcia v. Kelly-Springfield Tire Co.,* No. 8:99-CV-1611-T-17TGW, 2004 WL 5642430, at *2 (M.D. Fla. Mar. 2, 2004) (noting that expert had presented three different life care alternatives for Plaintiff, one based on continuing medical care in the United States, and two based on continuing medical care in Honduras); *Incardone v. Royal Caribbean Cruises, Ltd.*, No. 16-20924-CIV, 2018 WL 6520934, at *7 (S.D. Fla. Dec. 11, 2018) (finding that life care planner relied on sufficient methodology to reach conclusions of life care plan where she was "guided by the findings of defense experts, Plaintiffs' answers to interrogatories, Plaintiffs' experts' reports, and Plaintiffs' deposition testimony to prepare his life plan reports" and had also taken costs from "the Physicians Fee

Reference 2018").

Ms. Wingate's methodology begs the question of why a life care planner would ever follow industry standards and prepare a comprehensive LCP if a court permitted her to testify based upon the cursory approach employed in this case. Tellingly, Ms. Wingate herself has *never* testified based upon a medical cost projection in her 25 years as a certified life care planner. Wingate Dep., Ex. A, 69:14-22 ("I haven't had any testimony on a trial related to a medical cost projection."). For these reasons, Ms. Wingate's cost projections and corresponding opinions should be excluded in their entirety because they are based upon insufficient facts, her opinions are purportedly subject to no governing standards, her approach in ascertaining future medical costs violates the methodology applicable to LCPs, and her approach embodies all the hallmarks of an unreliable expert opinion.

### B. Certain future medical care projections are unreliable and unhelpful to the trier of fact.

Even if this Court does not exclude the entirety of Ms. Wingate's opinions, certain future cost projections are unreliable and unhelpful to the trier of fact. In addition to *Daubert*'s reliability prong, Rule 702 includes a "helpfulness" criterion — that the evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." In *Daubert,* the Supreme Court explained:

> This condition goes primarily to relevance. … [One] aspect of relevancy … is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. The consideration has been aptly described ... as one of "fit."

509 U.S. at 591-92; *see also, e.g., Guenther v. Novartis Pharm. Corp.*, No. 6:08-CV-456-ORL-31, 2013 WL 1277928, at *2 (M.D. Fla. Mar. 28, 2013) (Presnell, J.) (as gatekeeper, trial court

must verify that expert testimony or opinion will "assist the trier of fact" or "fit" a matter at issue) (quoting *Daubert*, 509 U.S. at 592); *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1193 (11th Cir. 2010).

### 1.     **Future surgeries**

Under Florida law, a plaintiff bears the burden to establish that "future medical expenses will more probably than not be incurred." *Montesinos v. Zapata*, 43 So.3d 97, 99 (Fla. 3d DCA 2010) (citing *Kloster Cruise Ltd. v. Grubbs*, 762 So.2d 552, 556 (Fla. 3d DCA 2000)); *see also Fravel v. United States,* No. 8:07-CV-979-T-MAP, 2009 WL 10671272, at *4 n.11 (M.D. Fla. Feb. 13, 2009) ("[P]laintiff must present evidence from which the jury could, with reasonable certainty determine the amount of such expenses the plaintiff would likely incur."). "That burden will only be met with competent substantial evidence." *Montensinos*, 43 So.3d at 99 (holding that, on remand, plaintiff would be allowed to submit "competent medical testimony that in the future it is more likely than not that a hip replacement will be needed").

Further, Florida law restricts recovery of future medical expenses to those expenses "reasonably certain" to be incurred. *Makas v. State Farm Mut. Auto. Ins. Co.,* No. 8:15-CV-2940-T-30MAP, 2017 WL 841077, at *2 (M.D. Fla. Mar. 3, 2017) ("There is no dispute that, under Florida law, future medical expenses have to be reasonably certain."). Future medical expenses cannot be grounded on the mere "possibility" or "mere probability" that certain treatments might be obtained. *White v. Westlund,* 624 So.2d 1148, 1150 (Fla. 4th DCA 1993); *see also Dillstrom v. State Farm Mut. Auto. Ins. Co*., No. 610CV1283ORL18DAB, 2011 WL

13298669, at *1 (M.D. Fla. Aug. 11, 2011) (noting that the Court "will not allow any speculation as to future medical expenses that may be incurred").

Ms. Wingate contends – both in her report and in her deposition – that all but one of the future surgeries listed in her MCP have a greater-than-50-percent probability of occurring in the future. Wingate Dep., Ex. A, 28:22-29:15. Ms. Wingate admits that she relied on Dr. Kantor to opine as to the necessity of Ms. Fitzsimmons' future medical care; indeed, as an occupational therapist who reviewed only limited information, Ms. Wingate is unqualified to opine as to Plaintiff's future medical care. Notwithstanding Ms. Wingate's report and testimony, in his deposition Dr. Kantor flatly contradicted Ms. Wingate, testifying that all future surgeries were "speculative" and "purely guesswork," and he refused to testify that the future surgeries projected had a greater-than-50-percent likelihood of occurrence. Kantor Dep., Ex. D, 252:7-253:24; 261:16-25.

As a threshold matter, the conflicting testimony and opinions of these experts renders each of the projected future surgeries unreliable and inadmissible under *Daubert*. In addition, such testimony will not assist the trier of fact in deciding the issue of damages because future medical care must be "reasonably certain" – or at a minimum more likely than not – to occur.

As to each surgery included in the MCR, Dr. Kantor testified generally that he could not answer regarding the likelihood of each surgery since this would be "speculative," "purely guesswork" and "so far down the road." Kantor Dep., Ex. D, 252:12-253:9. Based upon this testimony, the Court should exclude all future surgeries. *See* MCP, Ex. B, pg. 16, Line 38 to pg. 19, Line 41. Nevertheless, Dr. Kantor further testified as to each of the projected future surgeries.

**First**, Ms. Wingate's MCP includes a projected future surgery to occur in 2025 due to infection.

| Item / Service | Age | Year | Frequency/ Replacement | Purpose | Cost | Comment | Vendor |
|---|---|---|---|---|---|---|---|
| 4 Infection | 73 (Beginning) / 73 (Ending) | 2025 / 2025 | 1 time | Infection post surgery resulting in multiple staged surgeries and 2 hospital stays | Per Unit $508,482.00 to $510,285.00 / Per Year $1,016,964.00 to $1,020,570.00 | 10-15% chance of occurance | Sarasota Memorial Hospital Dr. Stolarski 41 |

Average charge at St. Mary's Medical Center for 7-10 day hospital stay and surgery = $500,000

However, Ms. Wingate and Dr. Kantor testified that there was only a 10-20%[4] chance of Mr. Fitzsimmons having future surgery related to an infection. Wingate Dep., Ex. A, 28:22-29:4; Wingate Report, Ex. C, pg. 17. When asked why this line item (totaling over $1,000,000) was included in her MCP, Ms. Wingate stated that, although it was not standard to include an item that has a less-than-50-percent occurrence, she wanted to add in "additional information." Wingate Dep., Ex. A, 29:5-12. Ms. Wingate ultimately conceded, however, that it was more likely the surgery would *not occur* than it is likely that it would occur. *Id.* at 80:2-5. Thus, Ms. Wingate's projection for a future surgery due to infection must be excluded.

**Second**, Ms. Wingate's MCP includes a projected future surgery to occur in 2025 due to periprosthetic pelvis/acetabular fracture.

| Item / Service | Age | Year | Frequency/ Replacement | Purpose | Cost | Comment | Vendor |
|---|---|---|---|---|---|---|---|
| 1 Total hip arthroplasty | 73 (Beginning) / 73 (Ending) | 2025 / 2025 | 1 time | Periprosthetic pelvis/acetabular fracture | Per Unit $265,320.62 to $266,011.39 / Per Year $265,320.62 to $266,011.39 | | Sarasota Memorial Hospital Dr. Stolarski 38 |

Average charge at St. Mary's Medical Center for 5-7 day hospital stay = $250,000

However, Dr. Kantor admitted that the percentage he would place on the possibility of a revision surgery for Mr. Fitzsimons due to periprosthetic fracture was between "**20 to 40 percent.**" Kantor Dep., Ex. D, 250:5-251:2.

---

[4] Dr. Kantor testified that this chance of occurrence was more in the range of 10-20% based on increased knowledge of revisions and complications related to the same. *See* Kantor Dep., Ex. D, 253:24-254:19.

16

**Third**, Ms. Wingate's MCP includes a projected future surgery to occur in 2033 due to periprosthetic femur fracture.

| Item / Service | Age | Year | Frequency/Replacement | Purpose | Cost | Comment | Vendor |
|---|---|---|---|---|---|---|---|
| 2 Total hip arthroplasty | Beginning 81 | 2033 | 1 time | Periprosthetic femur fracture | Per Unit $265,320.62 to $266,011.39 | | Sarasota Memorial Hospital Dr. Stolarski |
| | Ending 81 | 2033 | | | Per Year $265,320.62 to $266,011.39 | | 39 |

Average charge at St. Mary's Medical Center for 5-7 day hospital stay = $250,000

Dr. Kantor, however, could not even place a percentage on the likelihood of a revision surgery related to a periprosthetic femur fracture, stating that determining whether a revision related to a periprosthetic femur fracture would be "purely guesswork" since it is "so speculative and so far down the road." Kantor Dep., Ex. D, 251:3-9; 252:7-24.

**Fourth**, Ms. Wingate's MCP includes a projected future surgery to occur in 2035 due to hip dislocation.

| Item / Service | Age | Year | Frequency/Replacement | Purpose | Cost | Comment | Vendor |
|---|---|---|---|---|---|---|---|
| 3 Conversion dual mobility or constrained THA reconstruction | Beginning 83 | 2035 | 1 time | Hip dislocation | Per Unit $215,320.62 to $266,011.39 | | Sarasota Memorial Hospital Dr. Stolarski |
| | Ending 83 | 2035 | | | Per Year $215,320.62 to $266,011.39 | | 40 |

Average charge at St. Mary's Medical Center for 5-7 day hospital stay = $200,000 to $250,000

But, again, Dr. Kantor testified that he "can't answer that question" since Mr. Fitzsimons "has never sustained a dislocation here before," and therefore would be "introducing a dual mobility for treatment of something he hasn't had." Kantor Dep., Ex. D, 252:25-253:9.

As discussed above, "mere speculation and a small possibility" are insufficient to show that these medical expenses are "reasonably certain" to transpire in the future. *See also Volusia Cty. v. Joynt,* 179 So. 3d 448, 453 (Fla. Dist. Ct. App. 2015) (finding expert's testimony that it is "reasonably possible" that the plaintiff will require additional surgery on her ear and that "it would not surprise [him]" if he had to perform another surgery due to chronic drainage or

hearing loss, insufficient to show that these medical expenses are reasonably certain to be incurred in the future).

### 2. Medical Treatment related to future surgeries

Ms. Wingate's MCP includes medical care stemming from potential future surgeries discussed above. To the extent this Court excludes any or all of the surgeries identified above – because they were derived from an unreliable methodology and are not reasonably certain to occur in the future – all treatment stemming from the future surgeries must similarly be excluded. *E.g.* Wingate Dep., Ex. A, 72:17-20 (Q: "Would you agree with me that if Mr. Fitzsimmons does not undergo future revision surgery, that none of these physical therapy services are necessary?" A: "Correct."). All of the following projections in Ms. Wingate's MCP will be unnecessary if the future surgery does not occur:

- MCP, Ex. B, pg. 3, Lines 2-3: Orthopedic Surgeon (assessing right hip post THA revision)

- *Id.* at pg. 3, Line 4: Orthopedic surgeon (assessing right hip post surgery for hip dislocation)

- *Id.* at pg. 4, Lines 5-7: Physical therapy (assessing strength, range of motion and pain post surgery)

- *Id.* at pg. 5, Lines 8-10: Physical Therapy (Lower extremity strength, gait and mobility post surgery)

- *Id.* at pg. 6, Lines 11-13: CT – hip (Assess hip musculature and joint) (Wingate Dep. 74:2-5)

- *Id.* at pg. 6, Line 14 to pg. 7, line 17: Femur x-rays (assess femur post surgery) (Wingate Dep. 74:14-24)

- *Id.* at pg. 7, Line 18 to pg. 8, Line 21: Hip x-rays (assess hip joint and pelvis) (Wingate Dep. 75:1-10)

- *Id.* at pg. 9, Line 24: Ultrasound with aspiration and culture (assess joint for infection prior to surgery)

- *Id.* at pg. 20, Line 42 to pg. 21, line 44: In-patient rehabilitation (rehabilitation post THA revision)

Even if this Court does not exclude the entirety of Ms. Wingate's opinions (which it should), Ms. Wingate's future cost projections for surgeries and related care should be excluded because these specific opinions were derived from an unreliable methodology. Furthermore, these projections are not helpful to the trier of fact because these future medical expenses are not reasonably certain to occur, as required by Florida law.

## IV.  CONCLUSION

Ms. Wingate's opinions and corresponding medical cost projections should be excluded because she relied upon insufficient facts and data, utilized no accepted methodology, and violated the standards applicable to life care planners. Further, Ms. Wingate's opinions will not assist the trier of fact because, according to the testimony of Dr. Kantor, most of the medical care projections are not likely to occur in the future. As a result, Ms. Wingate's opinions and corresponding expert report must be excluded.

Date:  October 2, 2020

Respectfully submitted by:

/s/ *Traci T. McKee*
Traci T. McKee, Esq.
Faegre Drinker Biddle & Reath LLP
1050 K Street NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 312-7400
Facsimile: (202) 312-7461
*Admitted only in Florida; supervision by principals of the firm admitted to the D.C. bar.*

*Attorney for Defendants*

## LOCAL RULE 3.01(G) CERTIFICATION

The undersigned counsel certifies that she conferred with counsel for the Plaintiff, Brian Madden, in a good faith effort to resolve the issues raised in this Motion. However, the Plaintiff opposes the relief requested in the motion.

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

                                            */s/ Traci T. McKee*
                                            **Traci T. McKee**